**BRUNSWICK CORPORATION, Plaintiff,**

and

**Diab–Barracuda AB, Involuntary Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 534–88C.

United States Court of Federal Claims.

July 30, 1996.

206

Douglas B. Henderson, Washington, D.C., with whom were Tipton D. Jennings IV, Steven M. Anzalone, and James W. Edmondson, for plaintiff.

Jamie Sypulski, Chicago, Ill., for Involuntary Plaintiff.

Steven M. Amundson, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger and Vito J. DiPietro of the U.S. Department of Justice, for defendant.

## DAMAGES OPINION

ROBINSON, Judge:

This case, originally involving two patents, was brought before this court pursuant to 28 U.S.C. § 1498(a) (1988) and 35 U.S.C. § 100, *et seq.* (the "Patent Act"). The underlying infringement dispute concerns the U.S. Department of the Army ("Army")'s procurement of optical, infrared, and radar camouflage screens such as those used in Operations Desert Shield and Storm during the conflict in the Persian Gulf. Plaintiff, Brunswick Corporation ("Brunswick"), asserted that the camouflage screens supplied to the government by Teledyne Brown Engineering ("Teledyne") having a polyester/steel base cloth, including all camouflage screens and repair kits supplied under Contract Nos. DAAJ10–84–C–A117 (the "A117 contract") and DAAK01–85–D–B007 (the "B007 contract") and 10,500 polyester/steel camouflage screens supplied under Contract No. DAAK01–87–D–A060 (the "A060 contract"), infringe U.S. Patent No. 3,678,675 (the "Klein patent," " '675 patent" or "Klein '675"). Brunswick also argued that camouflage screens manufactured or purchased by Teledyne and Sioux Manufacturing Corporation ("Sioux") and provided to the government under the A117, B007, A060, DAAK01–87–A063 ("A063"), DAAK01–86–C–C288 ("C288"), DAAK01–86–C0180 ("C0180"), and DAAK01–86–C0182 ("C0182") contracts infringe the Sven–Goran Johansson patent (U.S. Patent No. 3,733,-606) for "Camouflaging Means For Preventing Or Obstructing Detection By Radar Reconnaissance" ("Johansson patent," " '606 patent" or "Johansson '606"). Brunswick obtained an exclusive license of the Johansson patent in 1974 from Diab–Barracuda AB ("Barracuda"), a Swedish company, under a royalty cost-savings incentive agreement.

Plaintiff is entitled to reasonable and entire compensation in the form of a reasonable royalty based on a compensation base of $35,503,039 and a royalty rate of 17%. In addition, plaintiff is entitled to delay compensation at an interest rate commensurate with the prime rate compounded annually and taxed only at the time of receipt.

## BACKGROUND

This Opinion shall be read in conjunction with the court's November 30, 1995 Opinion on liability, *Brunswick Corp. v. United States,* 34 Fed.Cl. 532 (1995), in which the court held that camouflage screens supplied under the A117 and B007 contracts were non-infringing but that screens provided pursuant to the A060, A063, C288, and C0180 contracts infringed the Johansson patent to the extent the infringing activity occurred within the seventeen-year period of patent protection. The Johansson '606 patent expired on May 15, 1990. The issue presently before the court is the precise measure of damages to which plaintiff is entitled. Following a formal status conference held in the National Courts Building, Washington, D.C. on February 23, 1996, the parties filed supplemental briefs on May 10 and 20, 1996, discussing their respective theories on the residual accounting issues in light of the Opinion on liability. The court's November 30, 1995 Opinion thoroughly sets forth the underlying circumstances of this litigation, and therefore, the mosaic of facts will not be restated here.

## DISCUSSION

Patent infringement actions involving the government implicate considerations not found in cases where the infringer is a private party, and these considerations render the two types of infringement less than perfectly analogous. Specifically, 28 U.S.C. § 1498 grants the government the absolute power to take a compulsory, nonexclusive license to a patented invention at will. *See Motorola, Inc. v. United States,* 729 F.2d 765, 768 (Fed.Cir.1984). The patent owner has no right to prevent the government from taking such a license, though it is entitled to "reasonable and entire compensation" by suing the government in this court. 28 U.S.C. § 1498. In the strictest sense, however, this exercise of the government's right is not a "taking" in violation of the Fifth Amendment, for the government has the statutory right to use a patented device. *De Graffenried v. United States,* 29 Fed.Cl. 384, 387 (1993). Given this fact and that the camouflage technology Brunswick licensed from Barracuda

has primarily military applications, it would not have been reasonable for Brunswick to have held an expectation of exclusivity. Further, it has been suggested that "lost profits may not be a 'viable measure of recovery under 28 U.S.C. § 1498,' where such damages would 'amount to excessive compensation, rather than just compensation payable under the Fifth Amendment.'" DONALD S. CHISUM, PATENTS (1995) § 20.03[6], at 20–454. *See Hughes Aircraft Co. v. United States,* 86 F.3d 1566, 1572 (Fed.Cir.1996) (citing *Leesona Corp. v. United States,* 220 Ct.Cl. 234, 599 F.2d 958 (1979) (en banc) with approval); *Tektronix, Inc. v. United States,* 213 Ct.Cl. 257, 266–67, 552 F.2d 343, 347–49 (1977).

## I. *Lost Profits*

■ Plaintiff persists in claiming entitlement to all of its lost profits as damages for patent infringement. Section 1498 of the Patent Act provides that the measure of damages for patent infringement is "reasonable and entire compensation." *Cf.* 35 U.S.C. § 284 (stating that for patent infringement by a private party, damages shall be awarded "adequate to compensate for the infringement, but in no event less than a reasonable royalty."). Plaintiff contends that the law entitles it to actual damages or lost profits. While long ago this court, in cases cited by plaintiff, has awarded lost profits in patent infringement actions, *e.g., Imperial Mach. & Foundry Corp. v. United States,* 69 Ct.Cl. 667, 669–70, 1930 WL 2439 (1930); *Waite v. United States,* 69 Ct.Cl. 153, 158, 1930 WL 2480 (1930), *rev'd on other grounds,* 282 U.S. 508, 51 S.Ct. 227, 75 L.Ed. 494 (1931), lost profits are not presently regarded as the most appropriate measure of damages. To receive lost profits, a claimant bears the burden of proving actual damages, including the causal nexus between infringement and lost profits. *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1585 (Fed.Cir.1995) (en banc). Further, the lost profits claimant must demonstrate an expectation of exclusivity such that the patentee or licensee proves *sine qua non* that but for the infringement, it would have enjoyed the benefit of the infringer's sales. *Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1551 (Fed.Cir.1994). Such causation is proved by showing: (1) demand for the patented product; (2) the absence of noninfringing alternatives; (3) the manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit that would have been made. *Id.* An award of lost profits is precluded if all of these elements cannot be proven. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 926 F.2d 1161, 1165 (Fed.Cir.1991). The burden of proving an expectation of exclusivity, and particularly the absence of noninfringing alternatives, rests on the patentee or licensee. *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 939 F.2d 1540, 1544 (Fed.Cir.1991).

■ While the lost profits approach is frequently used in patent infringement actions involving private parties, the reasonable royalty rate most often provides the proper measure of damages in governmental patent infringement actions. This holds true in the present case. Moreover, given the absence of a reasonable expectation of exclusivity, lost profits are *a fortiori* inappropriate. "The award of lost profits assumes a right to exclusivity. The eminent domain theory of Section 1498(a)—allowing the United States to take a license under the patent for use or procurement—is at odds with such a right to exclusivity." DONALD S. CHISUM, PATENTS (1992) § 20.03[6], at 20–207. In *Leesona Corp. v. United States,* 220 Ct.Cl. 234, 599 F.2d 958 (en banc), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979), this court's predecessor, in rejecting the trial judge's award of lost profits and doubled damages, held that in eminent domain patent infringement cases:

> An aggrieved party is entitled to receive only reasonable and entire compensation, not more than that. Unlike his counterpart in a private infringement suit, he is not entitled to be the recipient of increased damages heaped on other parties as punishment or deterrence.... The award of [such damages] from the infringement to the patentee would be more characteristic of a tort claim than of a suit for reasonable and entire compensation.

220 Ct.Cl. at 252, 599 F.2d at 969.

■ It is in the court's discretion to select the theory of compensation that most

adequately provides reasonable and entire compensation for patent infringement. *Unisplay, S.A. v. American Elec. Sign Co.,* 69 F.3d 512, 517 n. 8 (Fed.Cir.1995) ("We review the court's methodology used in calculating damages for an abuse of discretion"); *Maxwell v. Baker, Inc.,* 86 F.3d 1098, 1108 (Fed. Cir.1996). Moreover, whether damages are awarded pursuant to 28 U.S.C. § 1498(a) or 35 U.S.C. § 284, "[t]he size of an award is left to the trial court's sound discretion." *Hughes Aircraft Co. v. United States,* 31 Fed.Cl. 481, 484 (1994), *aff'd,* 86 F.3d 1566, 1572–73 (Fed.Cir.1996) (stating that trial judge's valuation determinations are reviewed for clear error and will be reversed only if the Federal Circuit is "left with the definite and firm conviction that mistake has been committed."); *Paper Converting Mach. Co. v. Magna–Graphics Corp.,* 745 F.2d 11, 21 (Fed.Cir.1984). Given the particular nature of the case at bar, this court determines that the lost profits approach is not the proper method for quantifying damages. Nevertheless, various considerations from the lost profits approach above may be taken into account in determining a reasonable royalty.

## II. Cost Savings

Plaintiff contends that it is entitled to the government's cost savings as compensation for infringement of the '606 patent. The government's cost savings are not a preferred indicator for calculating the measure of compensation. *Penda Corp. v. United States,* 29 Fed.Cl. 533, 574 (1993). This approach compares the costs of using a patented invention with the costs of using the best available unpatented alternative. *Amerace Esna Corp. v. United States,* 199 Ct.Cl. 175, 462 F.2d 1377, 1379–80 (1972). The cost savings analysis proves most useful in cases where there has been an invitation for bids ("IFB") with multiple contractors in which the difference between the lowest and next-lowest bids may be clearly calculated and used as a ceiling on a royalty. *See Leesona Corp.,* 220 Ct.Cl. at 250–51, 599 F.2d at 977–78. The court rejects the cost savings approach to quantifying damages also. Such a comparison often involves excessive speculation as to the costs associated with using an unpatented alternative, the effects of compe-

tition, and market fluctuation. This renders the cost savings analysis inherently unreliable and unsound in many cases. The court, therefore, declines to adopt this method of quantifying the measure of damages.

## III. Reasonable Royalty

Awarding a reasonable royalty has long been recognized as the proper measure of damages for patent infringement by the government. *Decca Limited v. United States,* 225 Ct.Cl. 326, 640 F.2d 1156, 1172 (1980); *Leesona,* 220 Ct.Cl. at 250–51, 599 F.2d at 968–69 (stating that the proper measure of damages is the injury to patentee rather than the government's taken benefit). Such royalties are calculated by determining a reasonable royalty rate and multiplying it by a reasonable compensation base. *Id.* There are two ways in which the court may arrive at a royalty rate. The court may examine actual licensing agreements, if any, and the corresponding royalty rates by those or similarly situated parties regarding the same invention at approximately the same stage of development. "Where an established royalty rate for patented inventions is shown to exist, that rate will usually be adopted as the best measure of reasonable and entire compensation." *Tektronix, Inc. v. United States,* 213 Ct.Cl. 257, 265, 552 F.2d 343, 347 (1977). If the court concludes that there is an established royalty rate for the patented subject matter in the relevant market such that a substantial number of licensees of the invention have considered it reasonable, then the court may adopt that royalty rate. *Rude v. Westcott,* 130 U.S. 152, 165, 9 S.Ct. 463, 468, 32 L.Ed. 888 (1889). However, "this rule is only useful where the royalty has in fact become established." *Badowski v. United States,* 150 Ct.Cl. 482, 483, 278 F.2d 934, 935–36 (1960). If there is no such established royalty rate, the court is compelled to construct retroactively a hypothetical negotiation between a willing licensor and a willing licensee regarding the patented device to determine the royalty rate on which the parties would have agreed. *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 898–901 (Fed.Cir.1986); *Hughes Aircraft,* 31 Fed.Cl. at 484–85.

While the court has rejected the lost profits approach to reasonable and entire compensation, it may nevertheless consider lost profits in setting a reasonable royalty rate. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed.Cir.1983); *Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed.Cir.1984).

### A. Date of Hypothetical Negotiation

 "[J]ust compensation is the value of the property taken at the time of taking." *Brooks–Scanlon Corp. v. United States*, 265 U.S. 106, 123, 44 S.Ct. 471, 474, 68 L.Ed. 934 (1924). When the government imposes a compulsory, non-exclusive license of patented subject matter, such a license is normally taken as of the first use of the infringing devices. *Pitcairn*, 547 F.2d at 1115. If, however, the government's activity directly caused a decrease in the infringed device's competitive pricing, then the date of the hypothetical negotiation and corresponding reasonable royalty rate may be adjusted accordingly.

> One of the two components of "reasonable and entire" compensation for the license is the value of the license, determined ordinarily as of the time the Government takes the license. However, if the taking is an integral part of a governmental project involving more than one license-taking and if the Government announced, prior to the taking, that it would engage in the project, the value of the license must be determined as of *the time the Government announced the project.*

*Decca Ltd.*, 225 Ct.Cl. at 335–36, 640 F.2d at 1167 (emphasis added).

 In late 1982, defendant issued a competitive solicitation for radar-scattering camouflage screens, which incorporated the standard Patent Indemnity Clause ("PIC"),[1]

meeting the Army's specifications to be awarded the following year. The court determines a date for the hypothetical negotiation at a point in time when the parties were in positions free of any commercial disadvantage caused by the government's on-going project solicitation that forced a supplier such as Brunswick to lower its prices to remain competitive. As of February 28, 1983, the government had deleted the standard PIC from its solicitation, was aware that taking a compulsory license from Brunswick, as it ultimately did, would likely be necessary, and would have known (through Assistant Secretary of the Army, Mr. J.R. Skulley) the government's bargaining position with respect to Brunswick's patent licensing and enforcement policies, the extent of the government's rights under the Manufacturing Methods & Technology ("MM & T") contract between plaintiff and the Army, and whether the government could obtain a direct license for camouflage screens from Barracuda.[2] By February 28, 1983, Mr. Kenneth Connolly, the government's contracting officer ("CO"), realizing that the government might require a license to avoid infringement liability, would have formulated defendant's negotiation strategy and would have been prepared to commence negotiations with plaintiff regarding a reasonable royalty rate. Accordingly, the court determines that the date of hypothetical negotiation is February 28, 1983.

### B. Reasonable Compensation Base

 This court adopts the total cost of procurement as the compensation base by which to multiply a reasonable royalty. This base includes, to the extent they have been proven, closely-related, originally procured items that may not actually be covered by the claims of the Johansson patent. However, the compensation base does not include

---

1. Incorporation of the government's PIC into the terms of a public contract places liability for patent infringement on the private contractors. Thus, removal of this clause at the contractors' request exposed the government to potential liability for infringement of the Johansson '606 patent.

2. Assistant Secretary Skulley wrote a letter to the Army's Deputy Commander of Material Readi-

ness ("DCMR") on January 27, 1983, in which he raised many of these solicitation issues and stated, "[w]e are especially concerned that our efforts to execute a competitive program are not impeded, and of course, we are concerned whether royalties are actually necessary." The letter requested that the DCMR respond by February 28, 1983.

items that merely constitute spare or additional parts or supplies. In *Leesona Corp.*, 220 Ct.Cl. at 261–62, 599 F.2d at 974–75, the Federal Circuit included the total, original procurement package in the compensation base. *Id.*

> Under the *entire market value rule*, it is not the physical joinder or separation of the contested items that determines their inclusion in or exclusion from the compensation base, so much as their financial and marketing dependence on the patented item under standard marketing procedures for the goods in question.

*Id.* (emphasis added); *see also Hughes Aircraft*, 31 Fed.Cl. at 485. Further, only those items delivered within the old seventeen-year patent term of 35 U.S.C. § 154 may be included in the compensation base. *Tektronix v. United States*, 216 Ct.Cl. 144, 152, 575 F.2d 832, 837 (1978) (stating that "the key dates [regarding post-infringement compensation] are the delivery dates, not the contract dates."); *see also Brulotte v. Thys Co.*, 379 U.S. 29, 31, 85 S.Ct. 176, 178–79, 13 L.Ed.2d 99 (1964) (disallowing post-infringement compensation royalties projected beyond the expiration of patent term as "unlawful *per se*"). Therefore, only the procurement costs for screens delivered within the statutory time period, i.e., before the invention passed into the public domain, shall be compensable as infringed. Specifically, the compensation base shall include those polyester/steel and carbon cloth camouflage screens delivered under the A060, A063, and C288 contracts through May 15, 1990, the expiration date of Johansson '606. In contrast, the compensation base shall exclude all screens shipped after patent expiration under the Teledyne C0180 and Sioux C0182 contracts. Thus, the compensation base shall be the first figure, $35,503,039, stipulated to by the parties in their March 15, 1996 Joint Status Report.

## C. Reasonable Royalty Rate

The court considers the 15 factors set forth in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), and recognized by the Federal Circuit, *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed.Cir.1991) (holding a 25% royalty reasonable and a 3% royalty unreasonable), to ascertain the exact royalty rate. *See also ITT Corp. v. United States*, 17 Cl.Ct. 199, 229–31 (1989). "This comprehensive list of evidentiary facts relevant, in general, to the determination of the amount of a reasonable royalty for a patent license ... drawn from a conspectus of the leading cases," comprises: (1) current, established royalty rates under the patent at issue; (2) royalty rates for comparable technology; (3) scope, exclusivity, and restrictiveness of a retroactive license; (4) the patent holder's established licensing and marketing practices; (5) commercial/competitive relationship of licensor and licensee; (6) derivative/convoyed sales of unpatented, accompanying materials by patentee and competitors; (7) duration of patent and license terms; (8) profitability and commercial success of invention; (9) utility and advantages of invention over prior art; (10) nature, character, and benefits of use; (11) extent and value of infringing use; (12) allocation of a portion of profits or sales for use of invention; (13) portion of realizable profits creditable to the invention alone; (14) expert testimony on royalty rates; and (15) the totality of other intangibles impacting a hypothetical negotiation between a willing licensor and licensee. *Georgia–Pacific*, 318 F.Supp. at 1120. In addition to the *Georgia–Pacific* factors, the court, in its discretion, may consider a variety of miscellaneous considerations occasionally used to determine the reasonable royalty rate. These additional factors include: reducing the royalty rate where the government procurement is massive; adjusting the royalty rate downward where viable alternatives to the infringed, patented invention are available; comparing the infringer's profits with the patent holder's risks and ability to license-out the subject matter; and adjusting the royalty rate upward if there were substantial capital expenditures associated with performance of the government contract. *See, e.g., Fauber v. United States*, 112 Ct.Cl. 302, 317, 318, 81 F.Supp. 218 (1948); *Trans–World*, 750 F.2d at 1568; *Tektronix*, 552 F.2d at 349. While the *Georgia–Pacific* factors are often probative of a reasonable royalty rate, the court is

neither constrained by them nor required to consider each one where they are inapposite or inconclusive. *Dragan v. L.D. Caulk Co.,* 12 USPQ2d 1081, 1008–89, 1989 WL 133536 (D.Del.1989), *aff'd,* 897 F.2d 538 (Fed.Cir. 1990) (stating that the *Georgia–Pacific* factors serve only as a general guide in the factual reasonable royalty rate inquiry and are material only where supported by relevant facts particular to each case); *Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 633 F.Supp. 1047, 1056 (D.Del.1986); *Syntex (U.S.A.) Inc. v. Paragon Optical Inc.,* 7 USPQ2d 1001, 1040, 1987 WL 124333 (D.Ariz.1987).

### 1. Existing licenses under the patent at issue.

■ Courts may give considerable weight to existing licenses as approximations of a reasonable royalty rate to the extent they provide direct and reliable evidence of the fair market value a willing licensee would have paid for the right to make, use, or sell the patented subject matter. However, existing licenses are not necessarily probative or conclusive of a reasonable royalty rate where external market pressures, exploitation, or cultivation of the patented technology subsequently alters the patent's licensing value. Defendant points out that Brunswick licensed-out the rights to the Klein '675 patent to Bekaert S.A. and Nippon Seisen in 1975 and 1980, respectively, for royalty rates of between 2% and 5%. Thus, defendant argues that a similar royalty rate should be applied to the '606 patent here at issue. Brunswick's licensing of the Klein patent, however, is of minimal relevance to the Johansson patent, especially since the court held in *Brunswick Corp. v. United States,* 34 Fed.Cl. 532 (1995) that the Klein patent was not infringed. On the other hand, Brunswick's Defense Division had established a policy of not licensing the '606 patent, with the exception of insignificant, obsolete technology licensed-out to foreign markets in Holland and Japan into which Brunswick deliberately chose not to enter directly.

Defendant also argues that a .5% to 2.5% royalty is appropriate because that is the rate at which Brunswick licensed the '606

patent from Barracuda beginning in 1974. Again, this previous license is of very little probative value, because *inter alia* it is too remote to accurately reflect a reasonable royalty rate. This licensing agreement occurred approximately nine years before the effective date of the hypothetical negotiation between Brunswick and the Army. It involved, what at the time was, technology of unproven utility, application, and marketability, and it did not account for all of Brunswick's subsequent diligence in perfecting application of the technology in the radar-scattering camouflage screens embodiment. *See Hughes Aircraft,* 31 Fed.Cl. at 491 (rejecting proposed royalty rate from previous license agreement premised on several conditions and entered into eight years before patent issued). Barracuda most likely would not have been able to exploit the '606 patent as effectively as Brunswick, and it would be improper to rely too heavily on Brunswick's business dealings with Barracuda in determining the reasonable royalty rate *vis a vis* the government's ultimate procurement. In any event, the evidence shows that Barracuda and Brunswick actually anticipated a higher royalty rate commensurate with Brunswick's profit margin of 20% to 30%. However, as oil prices skyrocketed during the relevant time period due to the Organization of Petroleum Exporting Countries ("OPEC") oil embargo, manufacturing costs were driven up and royalties under Brunswick's cost-savings incentive agreement with Barracuda were reduced to a minimum. Analysis of previous licenses is not compelling evidence of the appropriate royalty rate in this case.

### 2. Royalty rates for comparable technology.

The patent at issue is a pioneer patent, and therefore, there are no exactly comparable patent licenses and royalty rates from which to draw wisdom. Nonetheless, by looking at Brunswick's prior course of dealing while it was researching and designing its radar camouflage product line, the court recognizes that plaintiff paid between .145% and 5% in royalties. While these rates may prove helpful, they are not necessarily indicative of the rate that would actually have been agreed upon by the parties in this case since the

rates cited by the government pertain to technology licensed-in, rather than licensed-out, by Brunswick and also because the technology licensed-in could not successfully yield devices meeting the Army's specifications. Also, it is not uncommon for there to be a large gap between royalty rates at which successful company's license-in and license-out technology, especially where varying schemes of payment such as large cash advances are used, as in the case at bar. Therefore, the court is loathe to engage in undue speculation and finds that there are no comparable technology royalty rates.

3. Scope, exclusivity, and restrictiveness of license.

The hypothetical negotiation between the parties would certainly have taken into account the nature and effects of a license on plaintiff's ability to further exploit its rights to the '606 patent. Licenses taken under 28 U.S.C. § 1498(a) are generally characterized as non-exclusive. *Dynamics Corp. v. United States*, 5 Cl.Ct. 591, 605 (1984), *rev'd in part on other grounds*, 766 F.2d 518 (Fed.Cir. 1985). *Contra Decca*, 640 F.2d at 1180 (involving a one-time taking for a specific and unique government project). Nonetheless, in the case at bar, the label placed on the license is not dispositive since the fact remains that the government was perhaps the only viable consumer of the patented technology. Accordingly, the court reconstructs the factors the parties would have considered in arriving at a royalty rate with a view to the licensing agreement's scope, exclusivity, and restrictiveness. Further, it is well-established that a trial court should consider the entirety of circumstances, including the commercial effects of infringement on the patentee, in determining a reasonable royalty rate. *Hughes Aircraft*, 86 F.3d at 1573 (Fed.Cir. 1996) and the cases cited therein. To what extent would Brunswick's ability to take advantage of its camouflage business have been affected if it licensed-out the technology to the government, its principal, if not sole, consumer? Once the government obtained its license, it could thereafter procure radar camouflage screens freely from whomever it pleased. Indeed, it could conceivably have sole-sourced from Teledyne, plaintiff's most aggressive competitor, and excluded Bruns-wick from the domestic market altogether. Given the extent and sophistication to which Brunswick researched and developed its radar camouflage business to a highly profitable level, it defies reason to think that it would have abandoned or jeopardized this business advantage without demanding a very high royalty rate from the government.

4. Established licensing and marketing practices.

The evidence shows that Brunswick's Defense Division had a well-established practice of not licensing-out technology in areas where it could occupy a controlling market position. This was more the case where Brunswick felt it could secure a dominant proprietary position in a specific, growing, and freshly-cultivated market, such as the one at issue. While defendant argues that Brunswick's purported refusal to license was the inevitable result of its inability or failure to license, the evidence presented at trial simply does not support this position. Actions by the Army, the Pentagon, and Brunswick's competitor's, including Teledyne, led to the deletion of the PIC from the government's solicitation and indicates that several other companies were vying for positions from which to enter the radar camouflage business. Defendant argues that Brunswick's eventual willingness to license-out blended yarn fabric, protected by the distinct and uninfringed Klein patent, to Mount Vernon Mills Inc. ("Mount Vernon") and Riegal Corporation ("Riegal"), an unsuccessful bidder in the competitive camouflage solicitation, demonstrates Brunswick's unadulterated eagerness to license-out its technology. This conclusion, however, does not follow as discussed above in sub-section 1. The court's finding that Brunswick maintained a strict policy of not licensing out the technology protected by Johansson '606 tends to increase the appropriate royalty rate under *Georgia–Pacific*.

5. Commercial/competitive relationship of parties.

The Army and Brunswick maintained a typical government-government contractor relationship. As defendant points out, the Army was largely responsible for "creat[ing]

the environment in which Brunswick's camouflage business started, developed, matured, and prospered." *Df.'s Contentions of Fact and Law* at 140. However, the court disagrees that the government, by doing so and by soliciting the various public contracts, "shouldered most of the risk involved in Brunswick's camouflage operation." *Id.* The government's suggestion that it was doing Brunswick a favor by taking the '606 patent technology rings hollow, especially in light of the inherent advantages favoring the government in a competitive bidding system. Indeed, Brunswick bore the bulk of the business risk in pursuing the radar camouflage screen business and by securing an exclusive license of the Johansson patent from Barracuda. In turn, Barracuda, not the government, expended the labor in developing the patented technology. The court disagrees with defendant's assertion that Brunswick would have been shy or reluctant to ask for a 25% to 30% royalty because it "would have understood that its business had developed, and would continue to survive, largely through favorable arrangements with the Government." *Id.* Similarly, the court disagrees that this *Georgia–Pacific* factor militates in favor of a low royalty rate.

### 6. Convoyed sales of unpatented, accompanying materials.

"Where a hypothetical licensee would have anticipated an increase in sales of collateral unpatented items because of the patented device, the patentee would be compensated accordingly." *TWM Mfg.,* 789 F.2d at 901. Factor 6 turns on the theory that a willing licensee would be more willing to set a higher royalty rate during a hypothetical negotiation if it could expect to derive a collateral benefit from convoyed sales flowing to the infringer. Conversely, the patent holder would enter hypothetical negotiations to offset the damage caused by such collateral sales by the infringer. Examples of such potential convoyed sales in the present case include sales of transparent radar repair screens, parts, supplies, and accessories. In the present case, only the B007 contract expressly involved the sale of collateral products, in which Teledyne supplied repair kits and cloth assortments as separate line items. Performance under the B007 contract, however,

was found not to infringe either the Klein or Johansson patent. The evidence is unclear as to whether there were convoyed sales relating to the contracts in dispute. This factor, therefore, is not probative of the appropriate royalty rate in this dispute.

### 7. Duration of patent & license terms.

Factor 7 embodies the conventional wisdom that the longer the remaining duration of a patent term, the more willing a hypothetical licensee is to pay a higher royalty rate. This principle rests on the fact that the longer the duration of the patent, the more likely the patent holder is to cultivate goodwill, an intangible economic asset representing the ability of a business to generate income due to business reputation, market position, management, technology, customer relations, and other elusive indicia of earning power, which would almost certainly persist and benefit the patent holder long after the patent expired. Given that the government engaged in negotiations with Teledyne well before patent expiration, that Brunswick's competitor's chose to infringe rather than attempt to design around the patent or wait for its expiration, that the Army refused to consider adjusting its specifications in light of the '606 patent, and that the government's need for optical, infrared, and radar camouflage screens for use in Operations Desert Shield and Storm was imminent, Brunswick's ability to exploit its rights to the '606 patent were severely damaged during the relevant period. By the court's calculations, the date of the hypothetical negotiation is February 28, 1983, and the date of patent expiration is May 15, 1990. Thus, there was a duration of over seven years in the '606 patent's term, and this strongly favors the award of a high royalty rate.

### 8. Profitability and commercial success of invention.

The court looks to the '606 patent's profitability and commercial success for guidance in determining a reasonable royalty rate. An invention's profitability and commercial success, especially for pioneer patents with specific applications, allow the willing licensor to come to the hypothetical negotiating table with a strong bargaining position. A willing

licensee is inclined to pay a higher royalty for a fully developed, working invention that meets its exact specifications. *See Super Sack Mfg. Corp. v. Bulk–Pack, Inc.,* 1992 WL 96863 (E.D.Tex.1992); *Micro Motion, Inc. v. Exac Corp.,* 761 F.Supp. 1420, 1434–35 (N.D.Cal.1991), *rev'd in part on other grounds,* 894 F.2d 1318 (Fed.Cir.1990). Moreover, in determining the degree of commercial success, the court considers actual profitability of the exact technological area rather than speculative or expected profitability of a business generally. In other words, the court considers the actual profits of Brunswick's Defense Division, as opposed to its Bowling or Boating Divisions, in setting a reasonable royalty rate. Defendant's contentions that it expected Brunswick to anticipate estimated profit margins of 9.8% to 10.8% between 1985–1990 is of little relevance in this analysis. In contrast, defendant's expert witness, Mr. Harry F. Manbeck, former Commissioner of the US Patent and Trademark Office ("PTO") admitted that Brunswick's line of radar-scattering camouflage was indeed successful in the government market. This is confirmed by Brunswick's previous three contracts prior to the hypothetical negotiation date that yielded net profits of 24%, 25%, and 29% and tends to support a royalty rate above the government's proposed 4%. Nonetheless, "it is normally error to award all of the anticipated profits to the patent owner since a licensee would only enter into a hypothetical license on the supposition that he would make a reasonable profit." DONALD S. CHISUM, PATENTS (1992) § 20.03[3][b][iv], at 20–120. Moreover, there is a point in every hypothetical negotiation at which it simply becomes too expensive for a willing licensee to agree to a prohibitively high royalty rate. It is at this point that the potential licensee considers its alternatives and walks away from the negotiation table. While factor 8 supports a high royalty rate, it would be improper to set the rate so high as to, in effect, compensate plaintiff for lost profits.

### 9. Utility and advantages of invention over prior art.

Proven utility of an invention supports the award of a higher royalty rate. As discussed in the court's November 30, 1995 Opinion on liability, the Johansson patent is valid and meets statutory requirements for patentability including novelty, non-obviousness, and §§ 101, 112 utility under the Patent Act. Defendant admits that the lightweight radar-scattering camouflage screens here at issue were a significant improvement over the prior art, which taught the use of burlap camouflage cover that "was heavy, smelled when wet, and had no radar scattering properties." *Df.'s Brief on Accounting Issues* at 46. The claims of the Johansson patent relate to such radar-defeating camouflage, which overcame the long-felt but unsolved disadvantages of the prior art camouflage. As discussed in the court's Opinion on liability, an essential element of the claimed invention was its ability to minimize radar detection, as set forth in the government's detailed procurement specifications. The screens in this case embodied a significant improvement over the prior art, and this increases the royalty rate accordingly.

### 10. Nature, character, and benefits of use.

When determining the proper royalty rate, courts examine the "nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." *Georgia–Pacific,* 318 F.Supp. at 1120. The government argues that the camouflage screens were not of vital importance to the military, as evidenced by their Equipment Requirements Code ("ERC")–B and ERC–C designations rather than ERC–A, which corresponds to supplies with essential mission readiness and capability. In fact, defendant contends that the primary purpose of the screens procured under the various contracts listed above was merely to provide protection from visual observation rather than radar detection. The court can find no evidence to support this position. Even Mr. Connolly, one of the government's COs, stated that the military strove to "insure the continued availability of this *critically needed* item." *Record ("R.")* at 5203 (emphasis added). Indeed, the government could have saved itself a substantial amount of money if, in fact, it was not particularly concerned with procuring screens with radar-scattering properties. After reviewing

the Army's specifications and the claims of the Johansson patent, it is clear to the court that the tactical and commercial nature, character, and benefits of the screens at issue include anti-radar properties and that the Army benefited greatly therefrom. This is reflected in the massiveness of the procurement by the military. Thus, factor 10 also supports a high royalty rate.

11. Extent and value of infringing use.

This factor may be considered quantitatively and qualitatively. That is, the extent and value of infringing use may be gauged by the size of the procurement as well as the degree to which the patented invention has been incorporated by the infringing products. In a negotiation between a willing licensor and a willing licensee, whether hypothetical or actual, it is common for a government procurement of large magnitude to vary inversely with the corresponding royalty rate. *See e.g., Jamesbury Corp. v. United States,* 207 USPQ 131, 141, 1980 WL 20818 (Ct.Cl. 1980). Moreover, this royalty rate reducing effect is independent of whether the government actually aided in the development of the technological subject matter or not. Despite its Defense Division's policy of not licensing-out technology, Brunswick, like any other reasonable negotiator, would have considered the size of the screen procurement in deciding whether to accept a lower royalty rate. This factor, when viewed in terms of quantity, supports a lower rate. On the other hand, "[i]f this factor is interpreted to mean the extent to which the patented feature is incorporated into the [infringing] device, then this factor would act to increase the royalty rate somewhat." *Df.'s Brief on Accounting Issues* at 52. Such is the case here. Thus, factor 11's considerations tend to offset each other and are not germane to the award of a higher or lower royalty rate.

12. Allocation of a portion of profits or sales for use of invention.

This factor is helpful where analogous agreements concerning analogous inventions provide guidance as to the proper royalty rate. Defendant argues that Brunswick agreed to pay Barracuda and Dr. Gunter Pusch between 1% and 5% in royalties from sales of new camouflage to the government, including substantial, non-refundable advances. These arguments have already received full and fair consideration under factors 1 and 2 above.

13. Portion of realizable profits creditable to the invention alone.

Factor 13 lowers the reasonable royalty rate according to the infringer's addition of (unpatented) features, shouldered business risks, or improved manufacturing processes. 318 F.Supp. at 1120. Defendant only argues that its estimations of Brunswick's anticipated profits should reduce the royalty rate but does not discuss how the considerations of factor 13 support such a determination. In contrast, plaintiff argues convincingly that the success and profitability of the camouflage screens covered by the '606 patent are due exclusively to Brunswick's toil. Teledyne added nothing of significance to the patented subject matter, did not secure the procurement contracts through extraordinary advertisement or promotion, took advantage of a market cultivated by Brunswick, and bore relatively little business risk. Therefore, there is no evidence that supports lowering the royalty rate according to factor 13.

14. Expert testimony on royalty rates.

Georgia–Pacific factor 14 originates from 35 U.S.C. § 284, ¶ 3, which reads, "The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances." As with any expert testimony, the weight to be given such evidence depends on the expert's education, experience, and knowledge of the particular legal standards at issue. In *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir. 1978), the Sixth Circuit rejected the testimony of an expert witness, noting that his "experience was in the negotiation of licenses generally, and that he had no experience in the determination of a reasonable royalty rate after infringement." *Id.* at 1163. In the case at bar, there is a clash between the testimony of defendant's expert, Mr. Harry F. Manbeck, and plaintiff's expert, Mr. Donald W. Banner. Mr. Manbeck, who formerly drafted patent licenses at the General Electric Corporation from 1956–1990 and served

as the Commissioner of the US PTO, testified that a royalty rate of 5% is appropriate. Plaintiff attacked Mr. Manbeck's testimony on the basis of his: (1) complete inexperience in testifying on damages or the *Georgia–Pacific* factors; (2) failure to make a technical comparison of the 1983 technology of Barracuda and Dr. Pusch with the '606 patent; (3) ignorance of and failure to consider whether Brunswick's pre-competition contracts had been audited and what percentage of profit (20%–30%) Brunswick had been earning thereon; (4) unfamiliarity with the government's auditing procedures; and (5) unfamiliarity with relevant cases on-point, including *TWM Mfg.*, 789 F.2d at 901 (awarding a 30% reasonable royalty rate for a single patent). On the other hand, the government attacked the credibility of plaintiff's expert, Mr. Banner, another former Commissioner of the US PTO, by questioning: (1) the likelihood that all 15 of the Georgia–Pacific factors actually favor Brunswick, as asserted by Mr. Banner; and (2) the unwillingness of plaintiff's witness to recognize the resources provided and risk assumed by the government throughout the course of the radar camouflage procurement project. Both expert's testified credibly and within reasonable bounds. On balance, factor 14 is not conclusive for purposes of adjusting the reasonable royalty rate upwards or downwards.

### 15. Other factors impacting a hypothetical negotiation.

In addition to the *Georgia–Pacific* factors, the court, in its discretion, may weigh a variety of considerations in crystallizing the reasonable royalty rate from the swirling stew of considerations. Many of these considerations have already been examined in the 15–pronged *Georgia–Pacific* test or through the combination of several of the above considerations. Among these other factors are: (1) adjusting the royalty rate downward where viable alternatives to the infringed, patented invention are available; and (2) adjusting the royalty rate upward if there were substantial capital expenditures associated with performance of the government contract.

#### a. Viable noninfringing alternatives.

The facts are clear that Brunswick responded to the demand created by the government's solicitation for camouflage screens and possessed the production capacity to exploit said demand. Brunswick has not, however, proven the absence of noninfringing alternatives. As defendant points out, the fact that the screens under the A117 and B007 contracts did not infringe the Johansson patent, yet were accepted by the Army in June 1988 and used, is strong evidence that there were, in fact, viable noninfringing alternatives. Brunswick argues that the screens provided under these two contracts were improperly tested, did not meet the Army's original specifications, and never would have knowingly been accepted by the Army.

> The military specifications as of February 1984 required camouflage cloth having transmission in the range from 10 to 20% (DX 100), and could only be met by camouflage having a resistivity that infringed the '606 patent literally or under the doctrine of equivalents.... The only thing that has saved the Government from liability for infringement by these screens was the fact that no one suspected there were errors in Teledyne's test data.

*Pl.'s Supp.Brief on Damages* at 4. This argument, while creative and resourceful, ignores the fact that, ultimately, the A117 and B007 screens did not infringe the '606 patent. Despite the unusual circumstances where Teledyne's screens would have been infringing but for its poor aptitude for testing, the court must reiterate that the A117 and B007 screens were, in fact, noninfringing and accepted by the Army as alternatives. Hence, noninfringing screens did exist, and they were, at least to some extent, viable alternatives. This consideration functions against an elevated royalty rate.

#### b. Capital expenditures.

■ Plaintiff requests that it be compensated for its capital expenditures in addition to conventional damages for patent infringement. Defendant argues that in no event is plaintiff entitled to recover such expenses. In *Pl.'s Supp.Brief on Damages*, Brunswick summarized the relevant evidence, wherein it

lists its capital expenditures in view of the Opinion on liability for screens actually delivered through May 15, 1990, the '606 patent's expiration date, as $812,361. *See* PX 501. The government contends that no legal or factual basis exists for the reimbursement of capital expenditures and that Brunswick's request is "unprecedented under section 1498." *Df.'s Brief on Accounting Issues* at 86. Whatever funds Brunswick spent in this regard, argues defendant, would have been either expensed or capitalized. If the former, as in the case of equipment maintenance, then the expenses would have been absorbed or included in the costs of the contracts for camouflage screens. If the latter, as in the case of new machinery, the expenses became assets and paid for themselves in the form of elevated profits and improved productivity. Thus, defendant argues that Brunswick's capital expenditures are not recoverable since "those expenses would have been necessary even absent competition." *Id.* at 84.

Plaintiff attempts to refute defendant's condemnation of an award of capital expenditures by arguing that "recovery of these expenditures is the only way a Brunswick negotiator could justify agreeing to a license that would result in lost revenues from price reductions made by Brunswick to compete with an infringer." *Pl.'s Supp. Brief on Damages* at 14. Brunswick argues that capital expenditures must be awarded in addition to whatever other form of compensation the court selects, but plaintiff does not support this position with any legal authority. Ultimately, plaintiff requests this form of compensation and resolves the issue in the same breath. "These capital expenditures were damages Brunswick suffered as a direct consequence of the infringing activities, and the Court should *consider them as a factor* in determining how Brunswick is to be reasonably and entirely compensated...." *Id.* (emphasis added). This is precisely what the court has already done in its reasonable royalty rate analysis immediately above.

■ The court must agree with defendant that as a matter of law, there is no precedent for this court to award such damages directly. In *Leesona Corp. v. United States,* 198 USPQ 4, 1978 WL 14862 (Ct.Cl. 1978), the predecessor of this court specifically rejected the plaintiff's request for recovery of "capital expenditures made in anticipation of production of long-range Government projected requirements." *Id.* at 15–16. The Leesona Corp. argued that it should be placed in the same economic position it otherwise would have held but for the government's taking of the patentee's rights to its metal/air batteries, anodes, and associated devices. The trial judge ruled that there was no support for Leesona's novel theory of recovery, that it was not relevant that Leesona's loss might not be commensurate with defendant's gain, and that well-established, more effective alternative methods of quantifying reasonable and entire compensation existed. *Id.; see also* 220 Ct.Cl. at 258, 599 F.2d at 972–73. Accordingly, the *Leesona* court denied the award of capital expenditures as does the court in the present case. Nevertheless, the court in its discretion includes Brunswick's substantial capital expenditures in adjusting the royalty rate upward.

### IV. *Delay Compensation.*

■ Plaintiff also claims entitlement to delay damages. Recently, this court has set forth clearly the law on entitlement to delay damages, sometimes referred to as a form of pre-judgment interest.[3] In *Hughes Aircraft,* the court held that reasonable and entire compensation includes delay damages in an amount sufficient to compensate a prevailing patentee "for loss of use of royalties." 31 Fed.Cl. at 492. The well-recognized standard for delay damages mandates that a patentee whose exclusive rights to the patent have been infringed is entitled to receive that measure of compensation that would place it in the economic position it would have held had royalties been timely paid and prudently

**3.** The U.S. Supreme Court has construed the words reasonable and entire in the context of patent infringement by the government. As stated by Justice Holmes, "We are of the opinion that interest should be allowed in order to make the compensation 'entire.' In addition to the purpose of the word ... we cannot doubt that it was intended to accomplish complete justice as between the plaintiff and the United States." *Waite v. United States,* 282 U.S. 508, 509, 51 S.Ct. 227, 75 L.Ed. 494 (1931) (citation omitted).

invested to produce return and preserve the principal. Balanced against this purpose of making an aggrieved party economically whole is the process of selecting an interest rate. While "[t]he determination of the proper rate of interest or delay compensation is one of fact," *Dynamics Corp. of America v. United States,* 766 F.2d 518, 520 (Fed.Cir. 1985), there is a strong judicial policy in just compensation cases favoring the establishment of uniform interest rates in order to avoid discrimination among litigants.[4] *Miller v. United States,* 223 Ct.Cl. 352, 402, 620 F.2d 812, 838 (1980); *Pitcairn v. United States,* 212 Ct.Cl. 168, 186, 192, 547 F.2d 1106, 1118, 1121 (1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978). Further, interest rates shall be compounded annually since no prudent, commercially reasonable investor would invest at simple interest. Compounding interest annually, therefore, is more likely to place the patentee in the same financial position it otherwise would have held had royalties been timely paid, *Kirby Forest Indus. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984); *Dynamics Corp.,* 766 F.2d at 520; *Whitney Benefits, Inc. v. United States,* 30 Fed.Cl. 411, 413 (1994), and has expressly been approved of by the Federal Circuit. *Hughes Aircraft,* 86 F.3d at 1575–76 (Fed. Cir.1996); *Rite–Hite Corp.,* 56 F.3d at 1555 (en banc); *Dynamics Corp. v. United States,* 766 F.2d 518, 520 (Fed.Cir.1985).

Courts are loathe to use subjective indicia of the appropriate interest rate. Brunswick suggests that its after-tax Weighted Average Cost of Capital ("WACC"), ranging from 8.76% to 12.50%, be selected. "Brunswick's WACC is the most economically realistic and just rate to be applied. As an economic entity, Brunswick expects a return consistent with the cost of its capital. Brunswick had an internal policy requiring a projected return of 12% prior to approving a capital investment, i.e., a 'hurdle rate.'" *Pl.'s Brief on Damages* at 148. While this WACC may

potentially be the most likely rate to fully return Brunswick and its investors to the same economic position they otherwise would have held had royalties been timely paid and prudently invested, using the WACC utterly defeats the strong judicial policy of establishing uniformity in the award of delay damages. Indeed, this approach was rejected by the court in *Hughes Aircraft,* which stated:

> Adoption of the plaintiff's proposal to award delay damages to it on the basis of its unique return on equity would result in obvious discrimination between it and other just-compensation claimants entitled to delay damages by reason of the government's withholding of timely payment of principal over the same time periods.

31 Fed.Cl. at 492. Nonetheless, plaintiff's argument regarding full compensation has clear merit. Courts endeavor to apply a uniform rate while, at the same time, returning the aggrieved patentee to the economic position it would have held but for the government's imposition of a compulsory license. This court sets the interest rate for delay compensation at the *prime rate,* the lowest interest rate set by the Federal Reserve on financial depositories' borrowing and lending representative of the cost of doing business in the United States, to be compounded annually. Thus, delay compensation shall be paid from the date of infringement to the ultimate date plaintiff receives reasonable and entire compensation.

## V. *Taxation.*

The *Hughes Aircraft* decision very ably sets forth the appropriate method of tax treatment in governmental patent infringement cases. In its primary and supplementary briefs on accounting issues, defendant advanced a pre-judgment interest income tax adjustment theory that adjusts the damages base and accruing interest by the marginal tax rate, i.e., the highest rate at which a corporation pays taxes on its last remaining dollar earned within a given tax period.[5] Numerous courts have considered and de-

---

4. Courts have selected alternate "uniform" rates in the delay damages computation. These include: the rate of return on U.S. Treasury bills, the Prime Rate, the 26 U.S.C. § 6621 tax-overpayment rate, and the 41 U.S.C. § 611 Contracts Disputes Act rate.

5. The government's expert witness on defendant's proposed tax-adjusted delay compensation plan, Professor Robert R. Losey, was also the expert witness in *Hughes Aircraft,* in which the identical tax methods were advanced and rejected.

clined to embrace the government's proposed taxation plan for several reasons, including: (1) its repeated rejection by courts of various jurisdictions; (2) its excessively speculative nature; (3) its discriminatory and inconsistent treatment of just compensation claimants in different tax brackets; and (4) its unnecessary complexity in view of Congress' silence on requiring any abatement of damages interest. *See Hughes Aircraft*, 86 F.3d at 1575 (Fed.Cir.1996) (citing *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 503, 88 S.Ct. 2224, 2236–37, 20 L.Ed.2d 1231 (1968)) ("[C]ourts do not have to reduce a damage award by the amount of taxes that would have to be paid ... and it is equally applicable to delay damages."); *Polaroid Corp. v. Eastman Kodak Co.*, 16 USPQ2d 1481, 1541, 1990 WL 324105 (D.Mass.1990) (rejecting this tax treatment for *inter alia* "unbounded speculation" and possible multiplicative taxation); *Micro Motion Inc. v. Exac Corp.*, 761 F.Supp. 1420, 1436 (N.D.Cal. 1991). Therefore, in accordance with precedent, this court declines to adopt defendant's tax plan. Damages shall be taxed only at the time of receipt by Brunswick.

### CONCLUSION

After careful consideration of the testimony, exhibits, arguments, and the applicable law, the court has concluded that plaintiff is entitled to reasonable and entire compensation in the form of a royalty based on a compensation base of $35,503,039 and a royalty rate of 17%. In addition, plaintiff is entitled to delay compensation at an interest rate commensurate with the prime rate compounded on an annual basis and taxed at the time of receipt only. As discussed at the February 23, 1996 formal status conference, the parties shall perform the damages calculations in accordance with this Opinion and shall stipulate to the exact amount of compensation. The stipulation on damages shall be filed on or before August 13, 1996.

The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**